The Northeastern Railroad Company *v.* Chandler.

1. Nonsuit refused, not error.
2. Some evidence tending to show that the injuries received were of a permanent character, the Carlisle tables were admissible to show the expectancy of life.
3. Verdict not contrary to evidence.
4. Verdict not excessive.

December 2, 1889

Railroads. Nonsuit. Negligence. Damages. Evidence. Verdict. Before Judge HUTCHINS. Clarke superior court. April term, 1889.

Chandler sued the railroad company for damages, alleging as follows:   On June 2, 1888, he and his wife and little child were in a buggy traveling a public road in Jackson county, from Center to Jefferson.   When about a mile from Nicholson, a station on the railroad, it became necessary for them to cross the railroad track at the public road crossing.   The situations of this road, the railroad and the intervening objects were such as to prevent his seeing or hearing the cars until he was on the track.   Then he saw them not over 70 yards away, coming at the rate of 25 or 30 miles per hour.   He used every effort to free himself from his perilous condition, but before he could do so he was knocked 18 or 20 feet by the engine.   His left arm was broken in two places above the elbow, the piece of bone thus entirely separated being driven through the flesh and skin; his left hip was badly bruised; his stomach, back and left side were badly bruised and injured, his kidneys and bladder having been greatly affected ever since, rendering urination painful and often impossible without an instrument; he is almost disabled from doing any manual labor, suffers great pain, and can do no work requiring exertion of strength, and believes his back is probably permanently disabled; he still suffers from the bruises, and his arm is and will probably ever

be defective and partially useless. He has been unable to do any work on his farm, which has damaged him several hundred dollars; he was forced to remain away from his home for two weeks to his loss; and he was put to an expense of $100 for surgeons. He was entirely free from fault, and the accident resulted from the failure of defendant's agents to exercise ordinary and reasonable diligence and care to prevent it; they failed to blow the locomotive whistle at the blow-post or between there and the crossing, a distance of 400 yards, or to check and keep checking the speed of the train between those points. The engineer was not at his proper place and doing his duty.

The defendant pleaded not guilty. The testimony of the plaintiff and two physicians who had attended him was as follows: He was driving a gentle mule to an open buggy containing himself and his wife and eight months old baby, about 4 or 5 miles per hour, on the afternoon of June 2, 1888, going towards Jefferson. The railroad was higher than the public road at the crossing, and it was up-grade to the track. He was driving in a walk as he approached it. Discovered the train just as the mule got its front feet on the track. It did not whistle. It was then at the mouth of a cut about fifty yards from him. The public road goes down-hill a little before reaching the track, and then goes upward to it. Could not see the train before he did, because of the cut and some woods between. Could have heard it had it whistled, but did not hear it. It was coming pretty fast, and did not slacken speed. Had a patent singletree, and by pulling the strap could let the mule out of the shafts, but these were worn so that the tug would catch them. Pulled the strap, but the mule could not get loose because the left tug caught. Jumped out on the side towards the train and tried to slip the tug loose to keep the buggy off the track. Suc-

ceeded in doing so, but just then the train struck him, knocking him senseless eighteen feet into a gully about six feet from the track. In the meantime the buggy had rolled backwards, and its other occupants were unhurt; the mule had jumped forward off the track and was also uninjured. Could not see the train approaching until within twenty feet of the crossing, and then it was not in sight; did not hear it until it was right on him. After being struck, plaintiff got up, went about fifty yards to the nearest house and laid himself down on a bed. In the course of five minutes, could not raise up. The next evening, was carried about a mile on a bed to another house. Was confined to bed about two weeks; could not get about much for about six weeks. Was not able to do any work for six months. Suffered and still suffers from arm, breast, back and kidneys. Bladder has become relieved. Business was farming. Was nearly twenty-four years old, and was a stout man before being hurt. Could then make about $300 a year; crop amounted to about that much. Arm and back are weak; cannot lift much. Can make about one fourth of a hand. Was acquainted with the public road; it was there before the railroad was built. Did not know whether or not the train was on time. Did not look for it until he had passed the woods and was within twenty feet of the crossing; could not see it until then. Did not see it until it was at the mouth of the cut and the mule was on the track. Did not listen for it, and did not hear it till he saw it; was not thinking anything about it; did not know it was coming. Besides losing about six months' time, had to hire a hand to finish and gather crop, a servant to attend him, a physician whose bill was about $109, etc. Would have stopped on the hill if he had heard the whistle blow. If the train had checked and continued to check, or blown at the blow-post and con-

tinued to slacken speed, he would not have been hurt. One of the breaks in his arm was a common fracture; the other a compound fracture; the muscles were cut through by the broken bone. The arm was set by two physicians between eight and nine o'clock of the evening of the injury. It will never be a stout arm, but the bones knit together. They found him bruised in the back and hips and his bladder troubling him. One of them treated him afterwards for congestion of the left kidney. They testified that they thought his capacity to labor was permanently reduced; one could not say how much; the other thought from fifty to seventy-five per cent. It would be hard on him to hoe, or do anything requiring exercise of his back. There was improvement in his condition at the time of the trial, April, 1889. A month or two after it was first broken, one of the physicians was called in to set the arm again; plaintiff having attempted to pick up something while having something in his arms. The public road runs nearly parallel with the railroad for quite a distance and is three or four hundred feet from it, and between them is an open field. Then the public road gradually turns toward the railroad and crosses it diagonally. For six hundred or more feet before reaching the crossing, there are woods between the two roads, and the cut is parallel with these woods. One could see into the mouth of the cut just about the time he reached the track. A map, in evidence, testified to be a fair representation of the place, indicated that one going in the direction plaintiff was, would have to turn his head around to see in the direction the train was coming, if he had about reached the track. The blow-post was in the open field before reaching the woods.

The defendant moved for a nonsuit, on the ground that, according to plaintiff's own testimony, he contributed to the accident. The motion was overruled.

The defendant then introduced the testimony of its president, conductor, engineer, fireman and another employé (all these being on the train at the time in question), of two of its local agents and of a physician. This was, in substance, as follows: None of them saw the injury happen. The president and another witness were standing on the rear platform of the last car, the train being composed of seven or eight freight-cars, a baggage-car and a passenger-car. These two saw plaintiff's wife and baby in the buggy, and plaintiff sitting up fifteen or more feet from the track, in a ditch that runs along the public road, with dirt on his back and arms. The train was on schedule time, running at about twenty to twenty-five miles per hour, the usual rate between stations. The president did not notice that it slackened up for the crossing. When he reached the next station, Nicholson, he told the agent there to get a horse and go as quickly as he could to see after the plaintiff and his wife and child, and get them a doctor if needed. After the train had run about 150 yards beyond the crossing, he saw a mule with harness on, running. He had no authority to stop the train. By the time he got to the conductor, the train was about to Nicholson. As he looked across the open field before entering the cut, he saw no buggy. From the crossing to the end of the cut is 237 feet. A little distance before reaching the crossing, one can see 600 feet into the cut; a man in a buggy could probably see farther. At its deepest, the cut is only eleven and half feet high. The woods are not thick; they are mostly pine, some scrub oak. One can see under them. Perhaps they may be a little thicker in June than at the time of the trial, but there are only a few. It is not exactly a straight line from the blow-post to the crossing, and the latter cannot be seen at the former; about fifty yards below the post the line is straight. The engineer

blew the whistle, the signal for the crossing, sat on his box until the train moved fifty yards to the straight line, and then stepped to the fireman's side to put on the injector, an apparatus for putting cold water into the boiler and reducing steam. There were two of these, the one on the fireman's side being the smaller one and not putting in cold water as fast as the other. After working this, the engineer got back to his own box, the train having run, in the meantime, about 100 yards beyond the crossing. The track was clear when the engineer looked out just before stepping to the injector. He was always punctual in blowing at the blow-posts. The mule was 100 to 150 yards beyond the crossing when those on the train saw it as they passed. Hand-brakes were in use on the train. The conductor did not think the speed was slackened, but testified that the whistle blew at the post. Some of the tracks of the mule approaching the railroad indicated that, at a point about four feet before reaching it, the animal had turned aside. On the following day, the plaintiff stated, in a conversation, that he hardly knew anything after jumping from his buggy; hardly recollected anything else; did not know how he was hurt. An ordinary box-car is eleven and a half feet feet high from the track; some are higher; the engine was about fifteen feet high. Congestion of the kidneys of four or five months' standing would probably render a man unable to get about. It hardly lasts that long, but would leave some other trouble. Fractures of the arm are not generally permanent in their effects if properly treated. A man on the track struck by an engine moving 25 miles an hour and knocked eighteen feet, would necessarily have more bones broken than in his arm. If the gash the plaintiff showed in his coat was made by the engine (as he had testified), some of his ribs must have been broken.

In rebuttal, the plaintiff introduced    other testi-

mony tending to show that the whistle did not blow at
the post; that the speed was not slackened; that the
woods referred to had been thinned out since the injury
happened; that sometimes a train could be plainly
heard, and at other times not; and that his injuries and
sufferings were as he testified. He was corroborated
materially by his wife. Two witnesses testified, how-
ever, that they heard this train that day a mile away.
A witness for the defendant swore that she lived nearly
a quarter of a mile from the crossing, and saw plain-
tiff as he passed her house in his buggy going towards
the crossing; that he was going very fast; and that
she heard the train just before this. The Carlisle table
of mortality showed the expectancy of a man 24 years
old to be 38.59 years. The annuity table showed the
value of $1.00 at 7 per cent. for age 24 to be $12,037.
· The jury found for the plaintiff $2,000. The defendant
moved for a new trial on the grounds that the verdict
was contrary to law and evidence; that the court erred
in refusing a nonsuit; that he erred in allowing the
Carlisle mortality and annuity tables to be introduced
in evidence, over defendant's objection that plaintiff's
evidence did not show with sufficient certainty that his
injuries were permanent; and lastly, that the verdict
was excessive. The motion was overruled, and excep-
tion was taken.

Barrow & Thomas, for plaintiff in error.
Thomas & Strickland, contra.

Blandford, Justice.

A trial having been had, and judgment having been
rendered against the railroad company at the instance
of the defendant in error, it moved for a new trial upon
the grounds (1) that the court erred in not awarding a
nonsuit; (2) that the court erred in admitting the Car-
lisle mortuary tables in evidence to the jury; (3) that

the verdict of the jury is without evidence to support it; and (4) that the verdict is excessive.

1. We are of the opinion, under the facts of the case, that the court did right in refusing to grant a nonsuit. It requires no argument or demonstration to show that the plaintiff in the court below was entitled to recover.

2. There was some evidence introduced upon the trial of the case tending to show that the injuries received by the plaintiff were of a permanent character, and hence we think no error was committed by the court in admitting the Carlisle tables to show the plaintiff's expectancy of life.

3. What we have said about the nonsuit applies to the ground that the verdict was contrary to the evidence.

4. Taking all the facts and circumstances of the case into consideration, we do not think the verdict was excessive, or that it was so large as to lead to the belief that the jury were influenced by passion or prejudice.

*Judgment affirmed.*